# EXHIBIT E

Federal Communications Commission                                    FCC 03-153

Before the
Federal Communications Commission
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Rules and Regulations Implementing the ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

REPORT AND ORDER

Adopted: June 26, 2003                                    Released: July 3, 2003

By the Commission: Chairman Powell, Commissioners Abernathy, Copps and Adelstein issuing separate statements.

TABLE OF CONTENTS

                                                                                    Paragraph Number

I.   INTRODUCTION ......................................................................................................... 1

II.  BACKGROUND .......................................................................................................... 4
     A. Telephone Consumer Protection Act of 1991 ....................................................... 4
     B. TCPA Rules .......................................................................................................... 6
     C. Marketplace Changes Since 1992 ......................................................................... 8
     D. FTC National Do-Not-Call Registry and Telemarketing Rules ........................... 9
     E. State Do-Not-Call Lists ....................................................................................... 12
     F. Notice of Proposed Rulemaking .......................................................................... 14
     G. Do-Not-Call Implementation Act ........................................................................ 15

III. NATIONAL DO-NOT-CALL LIST ........................................................................... 16
     A. Background .......................................................................................................... 16
     B. Discussion ............................................................................................................ 25
          1. National Do-Not-Call Registry ..................................................................... 28
          2. Exemptions .................................................................................................... 42
          3. Section 227(c)(3) Requirements .................................................................... 55
          4. Constitutionality ............................................................................................ 63
          5. Consistency with State and FTC Do-Not-Call Rules ................................... 74

1

| Federal Communications Commission | FCC 03-153 |

IV. COMPANY SPECIFIC DO-NOT-CALL LISTS ............................................................. 86
   A. Background ............................................................................................................. 86
   B. Discussion ............................................................................................................... 90
      1. Efficacy of the Company-Specific Rules ......................................................... 90
      2. Amendments to the Company-Specific Rules .................................................. 92

V. INTERPLAY OF SECTIONS 222 AND 227 ................................................................. 97
   A. Background ............................................................................................................. 97
   B. Discussion ............................................................................................................. 100

VI. ESTABLISHED BUSINESS RELATIONSHIP .......................................................... 109
   A. Background ........................................................................................................... 109
   B. Discussion ............................................................................................................. 112
      1. Definition of Established Business Relationship ........................................... 113
      2. Telecommunications Common Carriers ......................................................... 119
      3. Interplay Between Established Business Relationship and Do-Not-Call Request .......................................................................................................... 124

VII. TAX-EXEMPT NONPROFIT ORGANIZATION EXEMPTION ............................. 125
   A. Background ........................................................................................................... 125
   B. Discussion ............................................................................................................. 128

VIII. AUTOMATED TELEPHONE DIALING EQUIPMENT ........................................... 129
   A. Background ........................................................................................................... 129
   B. Discussion ............................................................................................................. 131
      1. Predictive Dialers ........................................................................................... 131
      2. "War Dialing" ................................................................................................ 135

IX. ARTIFICIAL OR PRERECORDED VOICE MESSAGES ........................................ 136
   A. Background ........................................................................................................... 136
   B. Discussion ............................................................................................................. 139
      1. Offers for Free Goods or Services; Information-Only Messages .................. 139
      2. Identification Requirements ........................................................................... 143
      3. Radio Station and Television Broadcaster Calls ............................................ 145

X. ABANDONED CALLS ................................................................................................ 146
   A. Background ........................................................................................................... 146
   B. Discussion ............................................................................................................. 150
      1. Maximum Rate on Abandoned Calls ............................................................. 151
      2. Two-Second-Transfer Rule ............................................................................ 153
      3. Prerecorded Message for Identification ......................................................... 155
      4. Established Business Relationship ................................................................. 156
      5. Ring Duration ................................................................................................. 157

XI. WIRELESS TELEPHONE NUMBERS ...................................................................... 160
   A. Background ........................................................................................................... 160

2

B. Discussion ............................................................................................................... 165
    1. Telemarketing Calls to Wireless Numbers ................................................. 165
    2. Wireless Number Portability and Pooling .................................................. 168

XII.  CALLER IDENTIFICATION .................................................................................. 173
  A. Background ......................................................................................................... 173
  B. Discussion ........................................................................................................... 179

XIII. UNSOLICITED FACSIMILE ADVERTISEMENTS ................................................. 185
  A. Background ......................................................................................................... 185
  B. Discussion ........................................................................................................... 187
    1. Prior Express Invitation or Permission ....................................................... 187
    2. Fax Broadcasters ...................................................................................... 194
    3. Fax Servers ............................................................................................... 198
    4. Identification Requirements ....................................................................... 203

XIV. PRIVATE RIGHT OF ACTION ............................................................................... 204
  A. Background ......................................................................................................... 204
  B. Discussion ........................................................................................................... 206

XV.  INFORMAL COMPLAINT RULES ......................................................................... 207

XVI. TIME OF DAY RESTRICTIONS ............................................................................ 208

XVII. ENFORCEMENT PRIORITIES ............................................................................. 211

XVIII. OTHER ISSUES .................................................................................................. 215
  A. Access to TCPA Inquiries and Complaints ......................................................... 215
  B. Reports to Congress ........................................................................................... 217

XIX. PROCEDURAL ISSUES ....................................................................................... 218
  A. Regulatory Flexibility Act Analysis ....................................................................... 218
  B. Paperwork Reduction Act Analysis ..................................................................... 219
  C. Late-Filed Comments ......................................................................................... 220
  D. Materials in Accessible Formats ......................................................................... 221

XX.  ORDERING CLAUSES .......................................................................................... 222

Appendix A:  Final Rules
Appendix B:  Final Regulatory Flexibility Act Analysis
Appendix C:  Comments Filed

Federal Communications Commission                                    FCC 03-153

## I. INTRODUCTION

1.      In this Order, we revise the current Telephone Consumer Protection Act (TCPA)[1] rules and adopt new rules to provide consumers with several options for avoiding unwanted telephone solicitations. Specifically, we establish with the Federal Trade Commission (FTC) a national do-not-call registry for consumers who wish to avoid unwanted telemarketing calls. The national do-not-call registry will supplement the current company-specific do-not-call rules for those consumers who wish to continue requesting that particular companies not call them. To address the more prevalent use of predictive dialers, we have determined that a telemarketer may abandon no more than three percent of calls answered by a person and must deliver a prerecorded identification message when abandoning a call. The new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibits them from blocking such information. The Commission has revised its earlier determination that an established business relationship constitutes express invitation or permission to receive an unsolicited fax, and we have clarified when fax broadcasters are liable for the transmission of unlawful facsimile advertisements. We believe the rules the Commission adopts here strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers.

2.      It has now been over ten years since the Commission adopted a broad set of rules that respond to Congress's directives in the TCPA. Over the last decade, the telemarketing industry has undergone significant changes in the technologies and methods used to contact consumers. The Commission has carefully reviewed the record developed in this rulemaking proceeding. The record confirms that these marketplace changes warrant modifications to our existing rules, and adoption of new rules if consumers are to continue to receive the protections that Congress intended to provide when it enacted the TCPA. The number of telemarketing calls has risen steadily; the use of predictive dialers has proliferated; and consumer frustration with unsolicited telemarketing calls continues despite the efforts of the states, the Direct Marketing Association (DMA),[2] and the company-specific approach to the problem. Consumers often feel frightened, threatened, and harassed by telemarketing calls. They are angered by hang-ups and "dead air" calls, by do-not-call requests that are not honored, and by unsolicited fax advertisements. Many consumers who commented in this proceeding "want something done" about unwanted solicitation calls, and the vast majority of them support the establishment of a national do-not-call registry. Congress, too, has responded by enacting the Do-Not-Call Implementation Act (Do-Not-Call Act),[3] authorizing the establishment of a national do-not-call registry, and directing this Commission to issue final rules in its second major TCPA proceeding that maximize consistency with those of the FTC.

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227. The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq*.

[2] The Direct Marketing Association (DMA) is a trade association of businesses that advertise their products and services directly to consumers by mail, telephone, magazine, internet, radio or television. *See also infra*, note 47.

[3] Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 6101 (Do-Not-Call Act).

| Federal Communications Commission | FCC 03-153 |

3. The Commission recognizes that telemarketing is a legitimate method of selling goods and services, and that many consumers value the savings and convenience it provides. Thus, the national do-not-call registry that we adopt here will only apply to outbound telemarketing calls and will only include the telephone numbers of consumers who indicate that they wish to avoid such calls. Consumers who want to receive such calls may instead continue to rely on the company-specific do-not-call lists to manage telemarketing calls into their homes. Based on Congress's directives in the TCPA and the Do-Not-Call Act, the substantial record developed in this proceeding, and on the Commission's own enforcement experience, we adopt these amended rules, as described in detail below.

## II. BACKGROUND

### A. Telephone Consumer Protection Act of 1991

4. On December 20, 1991, Congress enacted the TCPA in an effort to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety.[4] The statute restricts the use of automatic telephone dialing systems, artificial and prerecorded messages, and telephone facsimile machines to send unsolicited advertisements. Specifically, the TCPA provides that:

It shall be unlawful for any person within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);

(C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine; or

---

[4] See TCPA, Section 2(5), reprinted in 7 FCC Rcd 2736 at 2744.

5

**Federal Communications Commission**   **FCC 03-153**

that call is not *by or on behalf of a tax-exempt nonprofit organization*.[420] Such calls, whether made by a live telemarketer or using a prerecorded message, would not be entitled to exempt treatment under the TCPA. We emphasize here, as we did in the *2002 Notice*, that the statute and our rules clearly apply already to messages that are predominantly commercial in nature, and that we will not hesitate to consider enforcement action should the provider of an otherwise commercial message seek to immunize itself by simply inserting purportedly "non-commercial" content into that message. A call to sell debt consolidation services, for example, is a commercial call regardless of whether the consumer is also referred to a tax-exempt nonprofit organization for counseling services.[421] Similarly, a seller that calls to advertise a product and states that a portion of the proceeds will go to a charitable cause or to help find missing children must still comply with the TCPA rules on commercial calls.

## VIII. AUTOMATED TELEPHONE DIALING EQUIPMENT

### A. Background

129. The TCPA and Commission's rules prohibit calls using an automatic telephone dialing system (or "autodialer") to emergency telephone lines, to the telephone line of a guest room of a health care facility, to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.[422] Section 227 defines automatic telephone dialing system as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[423] In the *2002 Notice*, the Commission explained that more sophisticated dialing systems, such as predictive dialers and answering machine detection software, are now widely used by telemarketers to increase productivity. We invited comment on these and other technologies and asked whether they fall within the restrictions on "automatic telephone dialing systems."[424]

130. Most industry members that commented on the issue of autodialed calls argue that predictive dialers do not fall within the statutory definition of "automatic telephone dialing system," primarily because, they contend, predictive dialers do not dial numbers "randomly or sequentially."[425] Rather, they state that predictive dialers store pre-programmed numbers or

---

[420] *See* NPCC Comments at 10; AFP Comments at 3.

[421] Unlike debt collection calls, a consumer may "terminate" an established business relationship with a company offering debt consolidation services by requesting placement on a company-specific do-not-call list. *See supra* note 358.

[422] 47 U.S.C. § 227(b)(1)(A)(i)-(iii); 47 C.F.R. § 64.1200(a)(1)(i)-(iii).

[423] 47 U.S.C. § 227(a)(1); *see also,* 47 C.F.R. § 64.1200(f)(1).

[424] *2002 Notice*, 17 FCC Rcd at 17473-74, paras. 23-24.

[425] *See, e.g.,* Mastercard Comments at 6; Verizon Comments at 23; HFS Comments at 7; Discover Comments at 8; CBA Comments at 7-8; Bank of America Comments at 5; ATA Comments at 113-114. *But see* American General Finance Comments at 1 (urging the Commission to clarify the definitions of "automatic telephone dialing system" (continued….)

76

Federal Communications CommissionFCC 03-153

receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers.[426] Most consumers and consumer groups maintain that predictive dialers are autodialers; that to distinguish technologies on the basis of whether they dial randomly or use a database of numbers would create a distinction without a difference.[427] They argue that for the recipient of the call, there is no difference whether the number is dialed at random or from a database of numbers.[428] A few commenters contend that even when a database of numbers is used, the numbers can be dialed in sequence.[429] In addition, LCC urges the Commission to clarify that modems used for non-telemarketing purposes are excluded from the definition of "automatic telephone dialing system."[430]

### B. Discussion

#### 1. Predictive Dialers

131. *Automated Telephone Dialing Equipment*. The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls.[431] The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.[432] As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.[433] The principal feature of predictive dialing

---

(Continued from previous page)
and "autodialer," which focus on equipment that *has the capacity* to generate random number and sequential dialing patterns, rather than on whether the equipment is actually used in that fashion).

[426] *See, e.g.*, Mastercard Comments at 6; HFS Comments at 7; Verizon Comments at 23; Discover Comments at 8.

[427] *See, e.g.*, EPIC Comments at 12; City of Chicago Comments at 9-11; Stewart Abramson Comments at 1-2; Michael C. Worsham Comments at 6.

[428] *See, e.g.*, Thomas M. Pechnik Comments at 4; Stewart Abramson Comments at 2 (FCC should not have to identify specific technologies covered by definition as technologies are always changing). *But see* Wayne G. Strang Comments at 6 (should ask Congress to change the definition to cover all devices capable of automatically dialing calls).

[429] *See* Thomas M. Pechnik Comments at 5; Michael C. Worsham Comments at 5.

[430] *See* LCC Comments at 7. LCC explains that, on behalf of certain clients, it installs terrestrial repeaters across the country, which receive satellite signals and retransmit the signals into areas that the signals would not otherwise reach. The repeaters contain an on-board modem, which may be programmed to call the client's number in the event a malfunction occurs. If the modem is programmed incorrectly, it may dial a number other than the number of the client. *See* LCC Comments at 2-3.

[431] *See, e.g.*, HFS Comments at 7; ATA Comments at 110; ABA Comments at 3.

[432] *See* ATA Comments at 113, n. 108; DMA Comments at 21 ("Some dialers are capable of being programmed for sequential or random dialing; some are not.").

[433] Mastercard Comments at 6.

77

Federal Communications Commission  FCC 03-153

software is a timing function, not number storage or generation. Household Financial Services states that these machines are not conceptually different from dialing machines without the predictive computer program attached.[434]

132. The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[435] The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "*capacity* to store or produce telephone numbers (emphasis added). . .." It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies.[436] In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective.[437] The basic function of such equipment, however, has not changed—the *capacity* to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.

133. The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers.[438] The TCPA does not ban the use of technologies to dial telephone numbers. It merely prohibits such technologies from dialing emergency numbers, health care facilities, telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call.[439] Such practices were determined to threaten public safety and inappropriately shift marketing costs from sellers to

---

[434] HFS Comments at 7.

[435] 47 U.S.C. § 227(a)(1).

[436] *See* 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies."). *See also Southern Co. v. FCC*, 293 F.3d 1338, 1346 (11th Cir. 2002) ("While the FCC is correct that the principle of nondiscrimination is the primary purpose of the 1996 Telecommunications Act, we must construe statutes in such a way to 'give effect, if possible, to every clause and word of a statute'.") (*quoting Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted)).

[437] ATA Comments at 113.

[438] NASUCA Comments at 4-5.

[439] One commenter suggests that databases of emergency and cellular numbers are commercially available which can be used to exclude emergency numbers, health care facilities and wireless numbers from an automated dialer's calling list. *See* ECN Comments at 3. The Commission is not persuaded that any such databases would include all numbers covered by the prohibition at 47 U.S.C. § 227(b)(1)(A), or that such databases are sufficiently accurate. Assuming, though, that predictive dialers can be programmed to avoid calling such numbers, there would be no reason to then exclude the dialing equipment from the TCPA's prohibition.

78

Federal Communications Commission                                    FCC 03-153

consumers.[440] Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome. Therefore, to exclude from these restrictions equipment that use predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented.[441] Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.[442]

134. *Predictive Dialers as Customer Premises Equipment*. A few commenters maintain that predictive dialers are Customer Premises Equipment (CPE)[443] over which the Communications Act gives the FCC exclusive jurisdiction.[444] The ATA and DMA urge the Commission to assert exclusive authority over CPE and, in the process, preempt state laws governing predictive dialers. They contend that, in the absence of a single national policy on predictive dialer use, telemarketers will be subject to the possibility of conflicting state standards.[445] In the past, CPE was regulated as a common carrier service based on the Commission's jurisdiction and statutory responsibilities over *carrier-provided* equipment.[446]

---

[440] *See* S. REP. NO. 102-178 at 5 *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972-73 (1991) ("The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services.").

[441] *See* 47 U.S.C. § 227(a)(1).

[442] Because the statutory definition does not turn on whether the call is made for marketing purposes, we also conclude that it applies to modems that have the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *See* 47 U.S.C. § 227(a)(1).

[443] Customer Premises Equipment is defined in the Communications Act as "equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications." *See* 47 U.S.C. § 153(14).

[444] *See* ATA Comments at 120; ATA Further Comments at 11-12; DMA Reply Comments at 17; WorldCom Comments at 41 (asserting that predictive dialers are customer premises equipment).

[445] *See* ATA Comments at 120-122 (noting that the Commission also has authority to forebear from adopting a specific rule governing predictive dialers to promote marketplace flexibility). *See also* DMA Comments at 17 ("Predictive dialers are customer premises equipment ("CPE"), and thus beyond the states' power to regulate pursuant to the Communications Act of 1934 and longstanding Commission rules and orders. These policies apply because predictive dialers are used interchangeably and inseparably for both inter- and intrastate communications, and are not susceptible to a segregated regulatory framework that would govern inter- and intrastate uses separately."); DMA Further Comments at 4.

[446] *See Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, Docket No. 20828, 77 FCC2d 384, Final Decision (1980) *(Computer II)*. In the *Computer II* Order, the Commission explained that " In conferring jurisdiction upon this agency over 'all instrumentalities . . . incidental to . . . transmission,' the intent was '. . . to give the FCC ability to regulate any charge or practice associated with a (continued....)

79

**Federal Communications Commission**                                          **FCC 03-153**

The Commission long ago deregulated CPE, finding that the CPE market was becoming increasingly competitive, and that in order to increase further the options that consumers had in obtaining equipment, it would require common carriers to separate the provision of CPE from the provision of telecommunications services.[447] As part of its review of CPE regulations, the Commission pointed out that it had never regarded the provision of terminal equipment in isolation as an activity subject to Title II regulation.[448] While the Commission recognized that such equipment is within the FCC's authority over wire and radio communications,[449] it found that the equipment, by itself, is not a "communication" service, and therefore there was no mandate that it be regulated.[450] None of the commenters who argue this point describe a change in circumstances that would warrant reevaluating the Commission's earlier determination and risk disturbing the competitive balance the Commission deemed appropriate in 1980.[451] In addition, it is not the equipment itself that states are considering regulating; it is the use of such equipment that has caught the attention of some state legislatures.[452] We believe it is preferable at this time to regulate the use of predictive dialers under the TCPA's specific authority to regulate telemarketing practices. Therefore, we decline to preempt state laws governing the use of predictive dialers and abandoned calls or to regulate predictive dialers as CPE.

(Continued from previous page) ─────────────────
common carrier service in order to insure that the carrier operated for the public benefit.'" *See Computer II*, 77 FCC2d at 450, para. 170.

[447] *Computer II*, 77 FCC2d at 442-43, para. 149; *see also In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace*, Report and Order, CC Docket Nos. 96-91 and 98-183, 16 FCC Rcd 7418, 7422, para. 5 (March 30, 2001).

[448] *Computer II*, 77 FCC2d at 451, para. 172. The Commission explained that "[e]quipment manufacturers, distributors, and even regulated carriers routinely offer terminal equipment for sale or lease on an untariffed basis."

[449] *See Computer II*, 77 FCC2d at 451-52, paras. 172-173. ("[S]uch activities are not necessarily beyond the jurisdiction of the Commission to the extent they are encompassed within the definition of wire or radio communications in Section 3(a) of the Act. The definitions of wire and radio communications in Section 3(a) and (b) are far-reaching and include 'all instrumentalities, facilities, apparatus, and services incidental to such transmission.'" Indeed we explicitly find that all terminal equipment used with interstate communications services are within the Act's definition of wire and radio communications. However, the fact that the provision of incidental 'instrumentalities,' etc. is within the subject matter jurisdiction of the Act does not mandate regulation of the 'instrumentalities.'") (footnotes omitted).

[450] *Computer II*, 77 FCC2d at 451-452, para. 173.

[451] The Commission earlier stated that "[a]ny regulation by tariff or otherwise of terminal equipment must be demonstrated to be reasonably ancillary to the effective performance of the Commission's responsibilities under Title II or 'imperative for the achievement of an agency's ultimate purposes.'") *Computer II*, 77 FCC Rcd at 451-52, para. 173.

[452] *See* Private Citizen Comments at 7 ("California will be implementing a 1% abandonment rate soon."); HFS at 7 ("California adopted legislation requiring a maximum for abandoned calls, but the regulatory body charged with setting the maximum has, to our knowledge, been unable to establish a maximum yet."). Oklahoma bans the use of automatic or predictive dialing devices that abandon more than 5% of calls answered per day per telemarketing campaign. *See* Okla. Stat. tit. 15, §755.1 (2002). Virginia failed to pass legislation proposing to regulate the use of predictive dialers. *See* S.B. 918, 2003 Gen. Assem. (Va. 2003).